ANGELINE C. JOHNSON, *et al.*, as Administrators, etc., Respondents, *v.* MARIA J. MYERS, Executrix, Appellant.

*Court of Appeals. November* 23, 1886.

Affirming same case, 35 Hun, 666, Mem.

1. *Evidence. Opinion.*—In an action for services rendered, a question asked of a witness who has some knowledge of the fact, as to what proportion of plaintiff's intestate's time was devoted to defendant's testator's business, calls for a fact within the witness' knowledge, and not for an opinion.
2. *Same. Value of Services.*—The character and ability of a person has much to do with the value of his services, where the duty to be done requires the best of judgment, a skill and ability beyond the average, is largely of a confidential character, and has no common

and general market value; and the person chosen to perform it has a right to be paid upon the standard of the capacity which enters into the work and forms the principal and essential value of the services.

Appeal from a judgment of the general term of the supreme court, affirming judgment entered on report of a referee.

*William G. Tracy*, for appellant.

*Chas. A. Hanley*, for respondents.

FINCH, J.—The plaintiff, as administratrix, recovered compensation in two separate actions for services rendered by Johnson to Myers in his lifetime, and to his executrix after his death. Myers appears to have been an able and successful, though somewhat illiterate, business man, whose enterprises were varied and extensive, widely scattered as to locality, and involving heavy risks of capital, and obstructed by adverse interests, and the frequent hostility of litigation. In executing his plans, he found it both necessary and wise to secure and use intelligent and trained assistance. To some extent he obtained the aid of Johnson, by joining him as an associate in his enterprises; but beyond that he employed him largely in his own affairs, putting confidence in the ability and honesty of the chosen agent. Necessarily the line between the partnership work of Johnson and that performed by him for the benefit of Myers individually was extremely difficult to draw, and, after the death of both parties, it has made an accurate and precise separation impossible, and to be accomplished only approximately, and by careful judgment, founded upon such evidence as the nature of the case permitted. No person was so likely to know, in a general way, the amount of service rendered by Johnson, as his wife. His coming and going; his telegrams and letters; the litigations calling him abroad; the meetings and conversations of the

parties,—would be within her knowledge to some considerable extent; not always accurately, in detail, but generally as a whole.

She testified that, in the summer of 1870, Myers, complaining of his arm, and saying that Johnson knew more about his business than any man living, sought his help to "settle up his business," and Johnson entered upon the work and furnished the assistance. That she told the exact truth in this respect is put beyond dispute by the letters of Myers, written mainly by his then secretary and agent Yoe. Under date of July 6, 1870, the latter writes that Myers is sick; and adds: " He wishes you to look after his affairs generally, until he is able to return." Under date of July 14, 1870, Yoe writes again that Myers is still sick, and "he desires you to look after his matters; and that, if you desire any one to counsel in his affairs, you will confer with T. B. Fitch, Esq., and if necessary, come to Syracuse to see him." Then follow thirty-four letters, running down to the middle of October, when Myers went to New York, where he died a few weeks later. The burden of Myers' letters is the detail of his business to be attended to. Much of it concerned the sale of the Trenton Arms Company to De Muir. While it is true that Johnson and Myers were joint owners of that property, the title stood in the name of Myers, who sold the whole of it to De Muir as early as December, 1869, and from that time on owed Johnson his proportion of the purchase price. Further subjects are the collections of mortgages, the discharge of judgments, the sale of houses, and the difficulty with Randall and Williams, in which Johnson seems to have had no personal interest. Beyond any question, the statement of Mrs. Johnson was true.

She further testified to an arrangement made with Fitch, after Myers' death, for the rendition of services to the estate. How entirely true that is becomes evident from the multitude of Fitch's letters calling upon Johnson, in

every conceivable shape, for information, advice and service; from the account of moneys received by Johnson, and paid over by him, running to about $100,000 ; and from numerous vouchers, in which the estate is found paying Johnson for his expenses and returning to him moneys advanced.    Mrs. Johnson further said that, from 1864, her husband was more or less occupied with the affairs of Myers and his estate.    This also was undeniably true.    The defendant elicited from her, on cross-examination, the fact that, in 1864, while they lived in Trenton, Johnson came to Syracuse every week, during six weeks, at the request of Myers, and that she knew it was on Myers' individual business : that he went to Brooklyn, attending to litigations, and consulted with lawyers.    Many letters during this period tend to corroborate her statements.

But what is quite as conclusive as a detailed examination of the services is the defendant's own request to find, marked " No. 6," and couched in this language : " That said William Johnson rendered some services for said Austin Myers during his life-time ; that the services so rendered by him were reasonably worth the sum of $3,600, and no more ; and that said item is a proper charge on this accounting, in favor of the estate of said Johnson."    In the face of this admission, it requires some nerve to insist that Johnson's services rendered all related to the joint property.

Mrs. Johnson, swearing to this knowledge, shown to be correct, and with abundant opportunity to know, and that the best of any living person, was then asked what proportion of Johnson's time was devoted to Myers' business.    To this it was objected that the witness was incompetent to give an opinion, and that it appeared that Johnson and Myers were partners.    The objection was overruled and an exception taken.    The witness answered : " One-half, from 1864 to the time of Johnson's death."    The objection was not sound.    The question called for a fact within the wit-

ness's knowledge, and not for an opinion. If a person, familiar with the character of Myers' business, had been asked how much of one man's time it would have taken to conduct or transact it that would have called for an opinion ; but if asked how much time it did take, no opinion would be sought, but a fact founded upon knowledge. That was the character of the question put to Mrs. Johnson. A fact was asked for of which she had some knowledge, and which she could answer to the extent of that knowledge.

How gravely inconsistent it would be for us to hold the admission of this question, error, is apparent from our own ruling in a much more debatable case. Hallahan *v.* N. Y., L. E. & Western R. R., 102 N. Y., 195. There the witness, who saw the passenger, answered : " I should judge " that deceased's elbow was not out of the window from the position that he held in the car. A motion to strike out the answer was denied on the ground that if the answer seemed an opinion it was in effect not one, but at least was admissible as an opinion founded upon knowledge. Estimates of time and value thus founded, are always admissible, and no objection was taken in this case that Mrs. Johnson had not sufficient knowledge. She swore that she had, the opportunity was certainly hers, and the facts corroborate and support the truth of her answer. Bearing upon them, as we have said, was a voluminous correspondence, read in evidence, the details of the defendant's own account against Johnson, which show a large mass of business done by him for Myers and his estate, resulting in the receipt and payment of very considerable sums of money, and the evidence of other witnesses as to services rendered and the value of the same. The finding of the referee upon the subject was not unreasonable, or outside of the inferences which were possible from the proof.

An exception was taken to a question put to Jewett, which was this : " Have you ever been with Col. Johnson

when he was professedly in Capt. Myers' business?" The ground of the objection was that the question called for the declaration of Johnson in his own favor. That was not the object or effect of the evidence. The purpose was not to prove by Johnson's statements that he was at work for Myers, but to show that the witness was acquainted with the kind of business in which Johnson was engaged, and which by other evidence it was claimed to have been shown, was that of Myers with a view of obtaining from the witness his estimate of the value of Johnson's services. This is made quite apparent by what immediately preceded the objection. Jewitt had said that he saw Johnson engaged in work which the latter represented to be that of Myers. A motion was made to strike out Johnson's declaration in the absence of Myers, and the motion was granted. The referee, therefore, certainly did not understand the word "professedly," used in the question as calling for a class of evidence just held by him to be inadmissible, and must have understood the inquiry as merely preliminary to the proof of value afterward given. It may be added that the answer was harmless. It showed the intestate ostensibly engaged in services for Myers, but not that he was so engaged or what the services were. The referee quite certainly understood that those facts were not proved by Jewitt.

The plaintiff was permitted to show what the value of the services of such a man as Col. Johnson was, and to this there was an exception. It is now argued that his character and ability had nothing to do with the value of the services. We think it had much. The duty to be done required the best of judgment, a skill and ability beyond the average, and was largely of a confidential character. It had no common and general market value. The work was not merely ministerial or a service which anybody could render. The business was varied and complicated and in many directions responsible, and the man chosen to perform it by reason of his capacity and ability had a right to be

paid upon the standard of the capacity which entered into the work and formed the principal and essential value of the services.

The remaining questions argued respect the counterclaims of the defendant which were disallowed upon the trial. In the main they depended upon pure questions of fact involving the credibility of witnesses and the drift and effect of items in the books of account. They were argued exhaustively before us, leaving upon our minds a conviction which a careful subsequent examination has strengthened, that they furnish no ground for a reversal of the judgments. The reasons given by the referee and the general term substantially cover the ground and meet our approval, and a renewed discussion of them is neither necessary nor suitable.

Each of the two judgments should be affirmed: That against the defendant, as executrix, without costs; and that against her as an individual, with costs.

MILLER, EARL and DANFORTH, JJ., concur; RUGER, Ch. J., RAPALLO and ANDREWS, JJ., dissent.